2021 IL App (1st) 180495-U

No. 1-18-0495

Order filed June 30, 2021

Fourth Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court |
| Plaintiff-Appellee, | ) ) | of Cook County |
| vs. | ) ) | No. 14 CR 17675 |
| ANTONIO JAMES, | ) ) | Honorable Thaddeus L. Wilson |
| Defendant-Appellant. | ) | Judge presiding |

JUSTICE MARTIN delivered the judgment of the court.
Justices Lampkin and Reyes concurred in the judgment.

**ORDER**

¶ 1     *Held*:  First degree murder conviction affirmed. (1) Circuit court did not err by providing the definition of reasonable belief as set forth in the Illinois Pattern Jury Instructions in response to a jury question indicating confusion about the meaning of that phrase. (2) Evidence was sufficient for the jury to find the first degree murder of a vehicle passenger was not mitigated by an unreasonable belief that defendant was justified in shooting at the passenger beside the decedent in self-defense. (3) Defendant's statement was not obtained in violation of his right to counsel as (a) no sixth amendment right to counsel attached when he was in custody for an unrelated offense, (b) he had no fifth amendment privilege against placement in a lineup, and (c) defendant, not police, reinitiated questioning after he previously invoked his rights. (4) Trial counsel was not ineffective for failing to object to prosecutor's statements in closing argument.

¶ 2        Defendant, Antonio James, appeals his convictions following a jury trial for first degree murder and two counts of aggravated battery with a firearm. We affirm.

¶ 3                                I. BACKGROUND

¶ 4        On July 3, 2013, at approximately 7:24 p.m., a sport utility vehicle (SUV) stopped beside Mitchell Simmons's Hyundai Sonata on the 6600 block of Champlain Avenue in Chicago. The driver of the SUV fired multiple gunshots into Simmons's automobile. Floyd Plant, Ernest McMullen, and Aaron Magee, who were passengers seated in the rear of the Sonata, were struck by bullets. McMullen was struck in the head and killed. Plant and Magee survived their injuries. Simmons and the front passenger Jalen Minor were not shot.

¶ 5        Antonio James was arrested for an unrelated armed robbery in March of 2014. While in custody and awaiting trial on the armed robbery charge, Chicago police investigating the July 3, 2013 shooting brought James to Area Central Headquarters on September 3, 2014. While there, James spoke with detectives and made statements admitting to shooting Plant, McMullen, and Magee. James was later indicted for first degree murder and other offenses related to the shooting. His counsel filed a motion to suppress asserting that (1) police obtained James's statements in violation of his fifth and sixth amendments right to counsel, which he had requested, and (2) a digital video file of a portion of his interview was unviewable. Defense counsel later filed an amended motion to suppress his statements arguing only that his statements were not voluntary.

¶ 6                          A. Pretrial Suppression Hearing

¶ 7        The trial court conducted a hearing on the motion to suppress statements on January 25, 2017. At that hearing, Detective John Halloran testified James was brought from the Cook County jail to Area Central on September 3, 2014, and placed in an interview room at 2:26 p.m. An electronic recording system was activated and captured video and audio of James's interview and

time in custody at Area Central. The electronically recorded interview (ERI) was provided to the trial court and the parties stipulated to its accuracy and admission into evidence.

¶ 8      According to the ERI, Detective Halloran took James to the men's room at 4:41 p.m. James complained that it was cold in the interview room. The detective responded that he had no control over the temperature. Upon returning to the interview room, Detective Halloran advised James of his *Miranda* rights. When asked if he was willing to answer questions about the July 3, 2013 shooting, James said, "no, not without an attorney." Detectives left the room promptly and told James to bang on the door if he needed anything.

¶ 9      Shortly before 9 p.m., another detective[1] brought James a jumpsuit and told him he was required to put it on for a lineup. James asked, "do I gotta do this now?" The detective responded that James "had no choice." James then asked the detective for something to drink. The detective agreed to bring him a juice or soda after the lineup was conducted. While placing the jumpsuit on, James asked if Detective Halloran was present and stated he wanted to answer questions. The detective told James he would convey that to Detective Halloran and left the room. Detective Halloran entered the room two minutes later. James said, "I wanted to know why I was here, so I'll answer your questions." Detective Halloran replied that James was there for investigation of a murder stemming from the shooting on July 3, 2013. Detective Halloran remarked that James told him he would not answer questions without an attorney earlier. He then advised James of his *Miranda* rights again and asked James if he wanted to waive those rights, including his right to an attorney, even though he had requested an attorney earlier. James responded that he did want to waive those rights and answer questions.

---

[1] The record does not provide the name of this detective.

¶ 10      Detective Halloran proceeded to tell James that witnesses said he was in the vehicle from which shots were fired on Champlain Avenue on July 3, 2013, and asked James whether he fired those shots. James denied it. In his hearing testimony, Detective Halloran admitted he falsely told James all four surviving vehicle occupants identified him when only Plant had done so. Detective Halloran then told James it was a "forgone conclusion" that he would be identified in the lineup and that James was "beyond being able to say, 'I wasn't there,' because you were there."

¶ 11      According to Detective Halloran's hearing testimony, James was then placed in a lineup with other participants wearing similar jumpsuits. Joseph Morrow, who had witnessed the shooting and previously identified James in a photo array, identified James as the shooter in the lineup.

¶ 12      After returning to the interview room, the ERI depicts Detective Halloran informing James he was identified in the lineup. Detective Halloran described other information pointing to James's responsibility for the shooting. He presented a picture depicting James standing next to the vehicle used in the shooting. Detective Halloran also told James he learned about an altercation in which James, or his uncle, hit one of the shooting victims in the head with a bottle at a party on the prior New Year's Eve. Detective Halloran spoke to James for 15 minutes. James was largely unresponsive but denied that he had hit anyone with a bottle. Detective Halloran left James alone in the room and the detective who said he would get James something to drink brought him a fruit punch and soda about 15 minutes later.

¶ 13      Around 11 p.m., detectives returned and brought James some food. James asked for a mattress to sleep on. About 10 minutes later, Detective Halloran returned with Detective Kristi Battalini. James had hardly touched the food and said he did not have an appetite. Detective Halloran summarized what he had told James he knew about the shooting earlier and that James only responded that he did not hit someone with a bottle in the New Year's Eve fight. Detective

Halloran asked if the shooting stemmed from the fight. James responded that it was "because of the fight," but was not the whole story behind why he shot at Plant. He explained that he initially believed the conflict with Plant could be resolved "without guns" and that he tried to "squash" the situation. But James claimed that Plant, along with another person, shot at him first while James was on his porch a couple weeks after New Year's. James averred that he did not go looking for Plant, but "just ran into him" on July 3, 2013. Referring to the shooting, James said, "I'm not gonna lie. I wanted [Plant]. I didn't want to kill him. * * * [McMullen] just got hit." Later in the conversation, James said he "was sending a message to him: shots fired at me, so shots fired back at him."

¶ 14        Detective Halloran repeatedly implored James to reveal what he did with the handgun so police could recover it and prevent "another kid" from being killed. James only responded, "it's gone." He did not reveal how or where he disposed of the weapon.

¶ 15        In the suppression hearing, defense counsel argued that James's will was overborne as he was left alone in a cold interview room for several hours without food or something to drink before he agreed to answer questions. Defense counsel acknowledged that police could question James without counsel about a crime unrelated to the armed robbery for which he was in custody.

¶ 16        The trial court noted that deliberate tactics to make a defendant "stew," go without food, or be held in a cold room for hours could be coercive, but the evidence here did not establish the police employed such tactics. Rather, the evidence showed police were dutifully preparing a lineup, interviewing witnesses, and performing other investigative tasks while James was in the interview room. Further, the trial court found James reinitiated communication with detectives after they honored his initial invocation of his *Miranda* rights. Moreover, in the court's assessment, James "was trying to fish for information" of what the detectives knew so he could formulate his

own narrative. Additionally, the court observed that James was only detained at Area Central from returning to the Cook County jail: he was not faced with a situation where he could have believed he needed to talk himself out of the situation so he could return home. Based on these circumstances, the court found James's statements were voluntary and denied the motion to suppress.

¶ 17                                    B. Trial

¶ 18                                  1. *Floyd Plant*

¶ 19        Floyd Plant testified he and his cousin Ernest McMullen were near the intersection of East 66th Street and South Evans Avenue in Chicago on July 3, 2013, when someone standing outside a brown automobile fired four or five gunshots. In response, Plant and McMullen ran to 67th Street where they got into the back seat of Mitchell Simmons's Hyundai Sonata. Simmons was in the driver seat and Jalen Minor was in the front passenger seat. Aaron Magee was seated in the back seat behind Minor. Plant knew both Simmons and Mitchell, but not Magee. Plant sat behind Simmons and McMullen sat in the middle between Plant and Magee.

¶ 20        Simmons drove away, turned onto South Champlain Avenue, and pulled over near 66th Street. A dark blue truck pulled alongside the passenger side of Simmons's Sonata. Plant could only see the driver, whom he identified in court as Antonio James. Plant observed James look in his direction, pull a dark handgun, and start shooting into the Sonata. Plant ducked as five or six shots were fired. The shooter's truck pulled away and turned down an alley. A bullet struck Plant in the right shoulder, and he observed that McMullen had been hit in the head. McMullen was unresponsive and did not appear to be breathing. Simmons drove to St. Bernard Hospital, where Plant was treated before being transferred to Stroger Hospital. Plant identified photos that showed the area on Champlain Avenue where the shooting occurred. He marked the location in the middle

of the block between 66th and 67th Streets where the Hyundai Sonata had stopped just prior to the shooting. He also identified photos of the Hyundai Sonata showing its rear window shot out and bloodstains on the rear seat.

¶ 21    Plant had known James for five years before the shooting. But when detectives spoke with him at the hospital, he did not give them James's name. Instead, he merely described the shooter as a "guy with dreadlocks." According to Plant, he did not give James's name at that time because he was thinking of getting revenge. Two weeks later, Plant went to a police station and told detectives that James was the shooter. From his mobile phone, Plant also showed police a photo of James in the same truck James was driving at the time of the shooting.

¶ 22    Plant recounted an incident that occurred at a 2013 New Year's Eve party he attended with McMullen at James's house. An altercation "started with females" and James's uncle hit Plant in the head with something. As a result, Plant received an injury to his left temple that required stitches. Plant testified that he was not angry at James and his family about his injury, at least "not where [he] would be shooting at [James's] house." He denied that he ever returned to James's house and fired shots. Plant also denied that he, McMullen, or anyone else inside of Simmons's Sonata had a firearm. He also claimed he had not seen James since the New Year's Eve fight.

¶ 23    Plant admitted he was facing a contempt charge for failing to appear when subpoenaed in this case and that he was currently in custody as a result. He also admitted to three prior felony drug convictions.

¶ 24                              *2. Aaron Magee*

¶ 25    Aaron Magee testified he was in the back seat of Mitchell Simmons's Sonata on July 3, 2013, around 7:24 p.m. Simmons was in the driver seat and Jalen Minor was the front passenger. On their way to 67th Street and Champlain Avenue, Magee heard gunshots. The Sonata stopped

on Champlain Avenue where they spoke about the shooting with two people standing on the sidewalk. Magee then saw Plant and McMullen running toward the Sonata from the direction of Evans Avenue. Plant and McMullen got in the back seat of Simmons's Sonata and asked him to drive them somewhere. Magee claimed that Plant had a handgun.

¶ 26       In his account, Magee then saw a shadow and a chrome handgun to his right. Four or five shots were fired. One shot struck him in the chest and collapsed his lung. He leaned forward to maintain his breathing. McMullen had been shot and slumped onto Magee. Simmons drove them to St. Bernard Hospital. Magee was transferred to another hospital where he spent 17 days.

¶ 27       Magee testified he had been wearing a black skull cap that fell to the floor of the Sonata when he bent over after being shot. He claimed that Plant put his handgun inside the cap and discarded it from the Sonata when Simmons made a brief stop while en route to St. Bernard Hospital. Magee identified a photo that showed what he identified as his black skull cap on the street on Champlain Avenue.

¶ 28       Magee admitted he was currently in the custody of the Illinois Department of Corrections (IDOC) serving a prison term for possession of a firearm and had prior felony convictions for drugs and vehicular hijacking.

¶ 29                                   3. *Jalen Minor*

¶ 30       Jalen Minor testified he was in the front passenger seat of Simmons's Sonata as Simmons drove him and Aaron Magee around on July 3, 2013. Plant and McMullen got in the car at 67th Street and Evans Avenue. Minor claimed Plant had a handgun. Simmons then drove to 66th Street and Champlain Avenue. While stopped there, Minor heard gunshots and put his head down. He stated he could not remember where the shots were coming from or how many were fired. Minor saw McMullen had been shot in the head and heard Magee say he had been hit. Plant threw this

weapon out of the Sonata at some point, and they drove to St. Bernard Hospital. Minor identified photos showing the area on Champlain Avenue where Simmons's Sonata had stopped and photos of the automobile.

¶ 31    When asked a series of questions about meeting with an Assistant State's Attorney (ASA) and giving a videotaped statement on September 3, 2014, about the shooting, Minor answered that he "possibly" talked to the ASA and "possibly" gave the statement. As to the content of his statement, Minor either said he did not remember specific assertions or denied that he ever made them. He similarly claimed not to remember his testimony before the grand jury on September 17, 2014. Minor acknowledged that he never said Plant had a firearm when questioned before. He explained he "didn't tell the whole story" because he was a felon who was on probation at the time, and he wanted to avoid being charged with possession of a firearm.

¶ 32    Minor admitted he was on probation for a felony drug case at the time of trial and had past felony firearm and drug convictions. He also admitted he had a pending contempt of court charge for failing to appear on this case.

¶ 33                              4. *Joseph Morrow*

¶ 34    Joseph Morrow testified he was standing on a friend's porch on the east side of the 6600 block of South Champlain Avenue after 7 p.m. on July 3, 2013, when he heard three or four gunshots coming from the direction of Evans Avenue. A short time later, a small automobile came around the corner and stopped on the opposite (west) side of the street. It was still daylight and Morrow could see two people in the front seat and three in the back. In the back seat, Morrow recognized McMullen and Plant because both were longtime neighbors. Soon after the automobile stopped, a dark blue or black SUV came around the corner and stopped alongside the automobile. Morrow identified James as the driver and sole occupant of the SUV. Morrow said James looked

toward him and he could see James's face. James had a firearm in his hand and fired five or six shots in quick succession into the automobile. Morrow did not see anyone in the automobile have a firearm or return fire. The automobile sped off and the SUV drove down an alley. Morrow identified James in a photo array on August 16, 2014, and in a lineup September 3, 2014. At trial, Morrow identified POD videos from the area showing the SUV.

¶ 35                                              5. *ASA Alexandra Molesky*

¶ 36          Assistant State's Attorney Alexandra Molesky testified she met with Aaron Magee on September 4, 2014, in offices outside of the room where the grand jury convenes. Magee was in custody at the time, serving a sentence in IDOC. ASA Molesky said she asked Magee open-ended questions about what he observed and remembered of the shooting. Magee never stated that Plant had a firearm. ASA Molesky then elicited Magee's sworn testimony before the grand jury in which Magee affirmed that he gave consistent statements to detectives in July of 2013 and later to ASA Michele Spizzirri, who put his statement in writing. In his prior statements and grand jury testimony, Magee said an SUV pulled alongside Simmons's Sonata where he was sitting next to McMullen and Plant. The driver pointed a chrome handgun at the back seat and fired several shots. Magee did not say Plant had a firearm in his prior statements or grand jury testimony.

¶ 37          ASA Molesky also testified she similarly met with Jalen Minor and elicited his sworn grand jury testimony on September 17, 2014. Minor was in the custody of the Cook County Department of Corrections at the time. Minor testified before the grand jury that a dark van or truck pulled alongside Simmons's Sonata and the driver, who had braids, fired shots into the back seat of the Sonata. Minor did not say that Plant had a firearm during his grand jury testimony. Also, before the grand jury, Minor affirmed that he gave a video recorded statement to ASA Spizzirri. The

parties stipulated to Minor's video recorded statement, which was played for the jury. In that statement, he likewise did not say Plant had a firearm.

¶ 38                                   6. *Officer Paul Presnell*

¶ 39       Officer Paul Presnell testified he is a forensic investigator in the Chicago Police Department. Presnell went to 6655 South Champlain Avenue on July 3, 2013, and took photographs and video of the scene. Presnell also photographed and recovered a black knit hat in the middle of the street on Champlain Avenue. It did not contain a firearm nor was any firearm found near the scene.

¶ 40                                   7. *Detective Kristi Battalini*

¶ 41       Detective Kristi Battalini testified Joseph Morrow identified James in photo array on August 16, 2014. Previously, Morrow had viewed a photo array on the day after the shooting. On that occasion, he stated one person—who was not James—looked similar to the shooter, but he would need to see an in-person lineup to make an identification.

¶ 42       Detective Battalini further testified Floyd Plant gave a description but did not name the shooter when detectives first spoke to him. About two weeks later, Plant came to a police station, identified James as the shooter, and provided a photo of James from social media. Detective Battalini explained that, despite Plant's identification of James, police did not arrest James for over a year because they were continuing to gather evidence.

¶ 43       Detective Battalini then recounted that James was arrested on September 3, 2014, and brought to Area Central for questioning. After being advised of and acknowledging his rights, James denied any involvement in the July 3, 2013 shooting. After being informed that he was identified in a lineup, James admitted he pulled alongside a small automobile and fired shots into the back seat at Plant. James stated there was "bad blood" stemming from a fight the prior New

Year's Eve when someone broke a bottle over Plant's head, requiring him to get stitches. James explained he tried to make amends, but Plant and another person fired shots at his house weeks later. James's interview was recorded on video and portions were published to the jury. James never claimed someone in the automobile had a firearm. Detective Battalini testified that the investigation never revealed evidence that anyone in the automobile had a firearm.

¶ 44                                    8. *Stipulated Medical Testimony*

¶ 45        The parties stipulated that the medical examiner determined McMullen's manner of death was homicide caused by multiple gunshot wounds, including to the head, upper left arm, left upper back, and left wrist.

¶ 46        The State rested and the defense presented witnesses.

¶ 47                                         9. *Nathaniel King*

¶ 48        Nathaniel King testified he is James's cousin, but they were raised like brothers. Plant and McMullen came to a 2013 New Year's Eve party at the house on South Dobson Avenue where James, Nathaniel, and other relatives lived. At some point, Plant accused Nathaniel of talking to his girlfriend and a fight broke out. Plant threw a punch at James and then had his arm around James's neck. Nathaniel and his uncle, Edward Durant, separated Plant from James. Plant was hit in the head with an object, but Nathaniel did not see who hit him. Plant and other guests left after police came to the house. Nathaniel's family moved the next day.

¶ 49        The following June, Nathaniel and James went to 67th Street and Rhodes Avenue to speak with friends and "squash everything" (make peace) about the New Year's Eve fight. Upon speaking with a friend named Raymond George, Nathaniel told James to get in their vehicle. Nathaniel was afraid "something might happen to [them]" and they left. Nathaniel did not see Plant during this excursion.

¶ 50      On October 22, 2017, Nathaniel was in custody in the Cook County Department of Corrections for a probation violation. While in line for food, Plant "sucker punched" Nathaniel in the face. Plant kept punching until guards sprayed him with mace.

¶ 51                    10. *Nortaniel King*

¶ 52      Nortaniel King testified he is the brother of Nathaniel King and Antonio James. In 2013, they lived with their mother and nine-year-old brother on Dobson Avenue. He recounted that sometime in April of 2013, between 11 a.m. and noon, he heard 12 to 15 shots very close to the house. Nortaniel was in a second floor bedroom and dropped to the floor. After the shooting stopped, he went to the window and observed Floyd Plant—with a firearm in hand—jog toward a vehicle, then turn and look around. Plant entered the vehicle, which Nortaniel recognized as Plant's black Impala, and it drove away. Nortaniel testified he was the only person in the house when this shooting occurred. Afterward, he called his mother and brothers to tell them about the shooting and warned them not to come home. Nortaniel did not call the police. He reasoned it was unnecessary to report as no one was injured, and he thought it was best to warn his family. The family stayed with relatives until they found a new house.

¶ 53                    11. *Alice Daval*

¶ 54      Alice Daval testified she lived next door to James's family on South Dobson Avenue. She recounted that sometime in the Spring of 2013, she observed a man she did not recognize walking from her neighbor's house to a dark colored vehicle. Daval opened the door to admit her daughter who had returned from shopping. After closing the door, she heard gunshots. She then observed the same man she viewed earlier enter the vehicle on the passenger side. Daval later called James's mother but learned she was already aware of the shooting.

¶ 55    On cross-examination, Daval testified she could only recall that the man was wearing a dark-colored hat. She acknowledged that she did not actually see who was firing shots. She never noticed any windows shot out or bullet holes in her neighbor's house. Daval did not call the police to report the shooting.

¶ 56                    12. *Antonio James*

¶ 57    Antonio James testified on his own behalf. James had known Floyd Plant and Ernest McMullen for several years before the shooting and they had been on friendly terms. At a 2013 New Year's Eve party at James's house, an altercation began when Plant thought Nathaniel was flirting with his girlfriend. In the ensuing fight, Plant put James in a headlock until someone hit Plant in the head. James and McMullen then threw punches at each other. The police came to the house and all their guests left.

¶ 58    Following the New Year's Eve fight, James said he tried calling Plant several times to "smooth things over," but his calls went unanswered. They never spoke. James learned that shots were fired at his house in April, though he was not present when it happened. The family moved afterward. Later, in early June, James was with Nathaniel in front of a friend's house near 66th Street and Rhodes Avenue. While there, James observed Plant walking in his direction on other side of the street. When Plant noticed James, Plant "stopped in his tracks," gripped his waist area, and displayed a firearm. Nathaniel rushed James to their vehicle and they drove away. After that incident, James acquired a revolver, which he kept in his Buick Rendezvous SUV. James was fearful of Plant and "just knew he was out to get me."

¶ 59    On July 3, 2013, James heard gunshots while he was driving in the vicinity of 67th and St. Lawrence Avenue. He could not tell where the shots were coming from, but hearing the shots prompted him to take the revolver from under the armrest and put it on the seat under his leg.

James turned from 67th Street onto Champlain Avenue where he saw people standing near an alleyway. He stopped to "see who was outside." Then, James noticed Plant sitting inside a "packed" silver automobile. James claimed Plant had a firearm in his hand. He was not sure if Plant looked at him, but explained:

> "I thought I was going to die. When I saw him with the gun knowing he had [*sic*] the guy that shot at my house. He the guy I just saw a month ago attempting to approach me with a gun. I thought I was going to die when I saw him with the gun.
>
> * * *
>
> I shot.
>
> * * *
>
> I panicked. I didn't think about it. I panicked."

After the shooting, the automobile drove off. James drove down an alley and went to his aunt's house. He "got rid of" the handgun.

¶ 60 James acknowledged that he initially told police he was not present or involved in the shooting. He further acknowledged that in his recorded interview he said, "I wanted [Plant]" and "I wanted to send a message." At trial, he attributed these statements to being scared, under pressure, depressed, and that he "just answered before thinking." He further explained that when he told detectives "shots fired at me" he meant Plant was out for him and had shot at his house. However, James said that his ERI statements did not mean he was out for revenge. Rather, he was "just telling [the detectives] whatever they wanted to hear at the moment." James admitted that he never told the police that Plant had a firearm, but said they never asked about it.

¶ 61 13. *Deputy DaSilva*

¶ 62    Cook County Sheriff's Deputy DaSilva[2] testified he is assigned to the Cook County Department of Corrections. On October 22, 2017, he observed Floyd Plant strike Nathaniel King several times in the upper body while both were inmates in the jail. Sheriff's deputies pepper sprayed Plant in the face twice, but he continued to hit King until deputies grabbed him and put him handcuffs.

¶ 63    *Jury Note*

¶ 64    The court instructed the jury on self-defense and second degree murder based on an unreasonable belief in self-defense. For the charges related to McMullen, the jury was provided a verdict form for guilty of second degree murder in addition to verdict forms for guilty of first degree murder and not guilty. The jury began deliberating at 11: 21 a.m. on November 17, 2017. At 2:10 p.m., the court received a note from the jury with the following inquiry:

> "Question for clarification: Do we as the jury determine for the purposes of mitigating factors if the definition of reasonable versus unreasonable is from our perspective or the Defendant's perspective? Are we determining reasonable from the Defendant's perspective or by our perspective from the weight of the evidence?"

With James, his counsel, and the prosecutors present, the court read the note. The court suggested responding with Illinois Pattern Jury Instruction, Criminal No. 4.13 (IPI Criminal 4.13), which provides the definition of "reasonable belief," and gave printed copies of the text of the instruction to both sides. Defense counsel agreed without argument or suggesting any other response. The State also agreed. On the bottom of the same sheet of paper with the jury's question, the court provided IPI Criminal 4.13 by writing:

---

[2] The record does not contain Deputy DaSilva's first name.

"Response: The phrases 'reasonable belief' or 'reasonably believes' mean that the person concerned, acting as a reasonable person, believes that the described facts exist."

The note bearing the court's response was sent to the jury at 2:41 p.m.

¶ 65    At 5:01 p.m., the jury notified the court it had reached a verdict. The jury found James guilty of the first degree murder of Ernest McMullen. The jury also found that in the commission of that crime, James personally discharged a firearm that proximately caused death. The jury further found James guilty of the aggravated batteries of Floyd Plant and Aaron Magee.

¶ 66    The court sentenced James to 30 years in prison plus a mandatory 25-year firearm enhancement for the first degree murder of Ernest McMullen, 15 years for the aggravated battery of Floyd Plant, and 10 years for the aggravated battery of Aaron Magee. The court ordered the aggravated battery sentences to run concurrent. However, by statute, the prison terms for the aggravated batteries were to be served consecutive to the 55-year term for first degree murder. Consequently, James's aggregate prison term is 70 years.

¶ 67    James appeals his convictions claiming (1) the trial court's response to the jury's note misled them to apply an incorrect standard to assess whether he acted under an unreasonable belief in self-defense, (2) the conviction for first degree murder should be reduced to second degree murder as he proved the mitigating factor of an unreasonable belief in self-defense, (3) his inculpatory statement should have been suppressed because it was obtained in contravention of his request for counsel, and (4) he was deprived of the effective assistance of counsel by various deficiencies in trial counsel's representation, including agreeing to the court's proposed response to the jury's question, amending his motion to suppress statements to omit an argument based on

his invocation of counsel, and failing to object to certain statements of the prosecutor in closing argument.

¶ 68                                II. ANALYSIS

¶ 69                          A. Response to Jury Note

¶ 70        James's first claim of error relates to the trial court's response to the note from the jury. The State avers that James forfeited this claim by both failing to object to the court's proposed response and failing to raise the issue in a posttrial motion. In addition, the State asserts we cannot review the claim because James's acquiescence to the response constituted invited error. Replying to those arguments, James contends the claim is not procedurally defaulted because a trial court has a duty to provide a legally accurate answer to a jury's question. He further argues the alleged error was not invited.

¶ 71        A defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion. *People v. Herron*, 215 Ill. 2d 167, 175 (2005). James did none of those before the trial court, so the issue is forfeited. Nevertheless, a forfeited issue can be reviewed under the plain error doctrine. Under the plain error doctrine, we may review an unpreserved claim of error when there was a clear or obvious error and either (1) the evidence was so closely balanced that the error itself threatened to tip the scales of justice against the defendant, regardless of the gravity of the error, or (2) the error was so serious that it resulted in an unfair trial to the defendant and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Sebby*, 2017 IL 119445, ¶ 48. James does not expressly request plain error review, but plain error is the only cognizable basis for review we can glean from the substance of his arguments in favor of review.

¶ 72        However, even plain error review can be forfeited when the defendant invites the error. *People v. Boston*, 2018 IL App (1st) 140369, ¶ 109. Specific to this issue, "[w]hen a defendant acquiesces in the trial court's answer to a question from the jury, the defendant cannot later complain that the trial court's answer was" erroneous. *People v. Averett*, 237 Ill. 2d 1, 23-24 (2010). A defendant must have at least suggested a different response from the one the court ultimately gave to invoke plain error review. *People v. Jaimes*, 2019 IL App (1st) 142736, ¶ 42. The defense did not do so in this case. The record only supports an affirmative acquiescence to the court's response, which constitutes invited error. *Cf. People v. Lawrence*, 2018 IL App (1st) 161267, ¶¶ 53-54 (finding defense counsel's express agreement with the trial court's response to a jury question was invited error precluding plain error review). Therefore, we will not review this claim under plain error.

¶ 73        Nonetheless, James also claims his trial counsel was ineffective for failing to object to the trial court's proposed response. A defendant can raise this issue under a claim of ineffective assistance of counsel, even if he affirmatively acquiesced to the response. *Id*. ¶ 55. To establish that a defendant was deprived of his constitutional right to the effective assistance of counsel, the defendant must satisfy the two-pronged *Strickland* test: he must show (1) counsel's performance fell below an objective standard of reasonableness and (2) a reasonable probability the result of the proceeding would have been different, but for counsel's errors. *People v. Peterson*, 2017 IL 120331, ¶ 79 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)). But a defendant cannot show prejudice to establish ineffective assistance based on counsel's failure to object to a jury instruction if the court did not err in giving the instruction. *People v. Williams*, 391 Ill. App. 3d 257, 271 (2009).

¶ 74      James claims the trial court's response was misleading and deprived him of fair consideration of a second degree murder verdict because the response "collapsed" the assessment of second degree murder into the determination of self-defense. The jury's note read:

> "Question for clarification: Do we as the jury determine for the purposes of mitigating factors if the definition of reasonable versus unreasonable is from our perspective or the Defendant's perspective? Are we determining reasonable from the Defendant's perspective or by our perspective from the weight of the evidence?"

On the bottom of the same sheet of paper, the court wrote:

> "Response: The phrases 'reasonable belief' or 'reasonably believes' mean that the person concerned, acting as a reasonable person, believes that the described facts exist."

¶ 75      James posits that the note's preface "for the purposes of mitigating factors" indicates the jury had found the State had proven all the elements of first degree murder, rejected his self-defense claim, and moved to consideration of second degree murder. James contends, the court's response was "fundamentally erroneous," "definitionally deficient," and "off by 180 [degrees]" as it misled the jury to require that he prove his belief in self-defense was reasonable for the jury to reduce the offense to second degree murder. Moreover, James claims that since the jury would have already found his belief in self-defense was not reasonable, the court's response could only lead the jury to reject finding him guilty of second degree murder.

¶ 76      We do not believe the trial court's response misled the jury to require that James prove his belief in self-defense was reasonable to mitigate the offense to second degree murder. James does not challenge the accuracy of the second degree murder instruction the court provided. Indeed, the

court's second degree murder instruction (Illinois Pattern Jury Instructions, Criminal, No. 7.05) (approved July 18, 2014) (hereinafter IPI Criminal 7.05)) was proper. Second degree murder is a lesser mitigated, not lesser included offense, of first degree murder with the same elements and required mental state. *People v. Staake*, 2017 IL 121755, ¶ 40. A first degree murder is mitigated to second degree when "at the time of the killing [the defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing [under self-defense], but his or her belief is *un*reasonable." 720 ILCS 5/9-2(a)(1)-(2) (West 2014) (emphasis added). Thus, the instruction permitted the jury to find that a mitigating factor existed to reduce the offense if "at the time of the killing the defendant believes that circumstances exist which would justify the deadly force he uses, but his belief that such circumstances exist is unreasonable." IPI Criminal 7.05.

¶ 77      Notably, this instruction clearly distinguishes between the subjective aspect—whether the defendant believed that circumstances exist which would justify the deadly force he uses—and the objective aspect—whether that belief was reasonable. The objective aspect is where second degree murder differs from self-defense. See *People v. Robinson*, 375 Ill. App. 3d 320, 335 (2007) ("Self-defense has both a subjective aspect and an objective one: the defendant must believe that a danger exists that requires the use of the force applied, the belief must be objectively reasonable, *and* the use of force must actually be necessary"). Jury instructions are to be construed as a whole; not read in isolation. *People v. Nere*, 2018 IL 122566, ¶ 67. And, here, the court specifically instructed the jury to follow all instructions, not to single out certain instructions and disregard others. See IPI Criminal No. 1.01. Since the jury also received an instruction on self-defense, it would have been apparent to the jury that the reasonableness of the defendant's belief is what distinguished second degree murder from self-defense.

¶ 78    Consistent with the difference from self-defense, the second degree murder instruction refers to *un*reasonable belief. IPI Criminal 7.05 (". . . but his belief that such circumstances exist is unreasonable"). The prefix "un-" is commonly understood to mean "opposite of" or "contrary to." Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/un (last visited May 21, 2021) (listed under prefix (1)). So, when provided the IPI definition of "reasonable belief" along with the second degree murder instructions' reference to "*un*reasonable" belief, jurors can be expected to understand that the meaning of "unreasonable belief" is the opposite of or contrary to the meaning of "reasonable belief." Thus, "un-" prefixed to "reasonable" in the second degree murder instruction already supplies the "180 degrees" of meaning James claims was absent from the court's response.

¶ 79    Jurors are presumed to follow the court's instructions. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995). Here, the court provided a proper instruction on second degree murder and an accurate definition of "reasonable belief"—a phrase used in the instruction but modified by the prefix "un." Both are provided by the Illinois Pattern Jury Instructions, are readily understandable, and accurately state the applicable law. It was not a riddle. Moreover, the court's response appears to have resolved any confusion as the jury did not submit any further notes related to the instructions. Accordingly, we presume the jury understood the second degree murder instruction and followed it. "The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them. * * * [W]e adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions." *People v. Rouse*, 2014 IL App (1st) 121462, ¶ 80 (quoting *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985)).

¶ 80    James submits that instead of the IPI definition of "reasonable belief," "[t]he jury should have been instructed that the question was: did Antonio James believe that the use of deadly force was proper, albeit unreasonably."[3] "Generally, a trial court must provide instruction when the jury has posed an explicit question or asked for clarification on a point of law arising from facts showing doubt or confusion." *Averett*, 237 Ill. 2d at 24. But "[a] trial court may, nevertheless, exercise its discretion to decline answering a question from the jury under appropriate circumstances." *Id*. Here, the trial court did not answer the jury's question directly as posed; that is, the response did not simply reply with "the defendant's perspective" or "your perspective" consistent with the either-or manner of the question as written. Thus, the court exercised its discretion to decline to answer the question as posed but provided an additional instruction that the court believed would resolve the confusion underlying the question. We believe that course of action was proper. "Appropriate circumstances [to decline to answer a jury question] include when the jury instructions are readily understandable and sufficiently explain the relevant law, [and] when additional instructions would serve no useful purpose or may potentially mislead the jury * * *." *Id*. The trial court's action indicates it determined that the instructions already provided, including the second degree murder instruction, along with the IPI definition of "reasonable belief" were readily understandable and sufficiently explained the relevant law. As explained above, we agree.

¶ 81    In addition, the court's response indicates it found confusion about the meaning of "reasonable belief" to underlie the jury's question. A request for clarification about a phrase in a jury instruction indicates the jury was confused about its meaning. *People v. Gray*, 346 Ill. App.

_____

[3] In his brief, this sentence continues, "not whether the *jury* would have held that belief." This characterization of the meaning of the court's response differs from the brief's other contentions on the issue. In general, the arguments presented on this claim of error are inconsistent.

3d 989, 993 (2004). Since the jury had been provided instructions on self-defense and second degree murder that use variants of "reasonable belief," we believe the court properly construed the jury's question, which sought clarification, as indicating confusion about the meaning of that phrase. And since the Illinois pattern instructions provide a definition of the phrase, responding with the IPI definition was a better approach than crafting a response using the terms in which the jury posed its question—an action with greater potential to mislead the jury. "Illinois pattern instructions were painstakingly drafted with the use of simple, brief and unslanted language so as to clearly and concisely state the law, and, for that reason, the use of additional instructions on a subject already covered by IPI would defeat the goal that all instructions be simple, brief, impartial and free from argument. [Citations]." [Internal quotation marks omitted.] *People v. Boston*, 2018 IL App (1st) 140369, ¶ 116.

¶ 82      For James's argument to have merit, we would have to conclude the IPI definition of "reasonable belief" given together with the IPI second degree murder instruction do not accurately state the law. But that simply is not so. Both are accurate and the IPI definition of "reasonable belief" does not contradict or modify the second degree murder instruction. Rather, the former supplies the accurate meaning of a phrase used in the latter. These instructions are frequently given together. James cites no instance where such was found to be error, nor do we find giving both instructions to have been error in this case. Ultimately, the jury was properly instructed. It remained their task to apply the law to the evidence and to determine defendant's guilt. Accordingly, James cannot establish ineffective assistance for failing to object to the court's response to the jury's question.

¶ 83                                    B. Second degree murder

¶ 84    James argues he satisfied his burden to prove the mitigating factor that he used deadly force under an unreasonable belief that he was justified in doing so as necessary to defend himself when he saw Floyd Plant with a firearm. On that basis, he requests that we reduce his conviction to second degree murder.

¶ 85    As noted above, second degree murder is a lesser mitigated, not lesser included offense, of first degree murder with the same elements and required mental state. *Staake*, 2017 IL 121755, ¶ 40. A first degree murder is mitigated to second degree when "at the time of the killing [the defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing [under self-defense], but his or her belief is unreasonable." 720 ILCS 5/9-2(a)(1)-(2) (West 2014). The defendant bears the burden to prove by a preponderance of the evidence that (1) unlawful force was threatened against him, (2) he was not the initial aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, and (5) he subjectively believed a danger existed that required the use of force. *People v. Jeffries*, 164 Ill. 2d 104, 129 (1995). Whether the defendant's actions were committed under these factors is a question of fact for the jury to resolve. *People v. Bennett*, 2017 IL App (1st) 151619, ¶ 43. When reviewing a defendant's claim that he proved he acted under an unreasonable belief in self-defense, we consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996). We must affirm if any rational trier of fact could have found the defendant failed to prove any one of the five *Jeffries* factors listed above. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 160.

¶ 86    In reviewing the evidence in the light most favorable to the State, a rational trier of fact could find James failed to prove that he acted with a subjective belief that he was justified to shoot

at Plant in self-defense. The jury heard evidence that Plant had fired shots at James's house sometime before this shooting. However, the jury was not required to accept that as fact. *People v. Garcia*, 407 Ill. App. 3d 195, 203-04 (2011) (quoting *People v. Huddleston*, 243 Ill. App. 3d 1012, 1018-19 (1993)) ("the fact finder is not required to accept as true the defendant's evidence in support of [self] defense"). At trial, James testified that the shooting at his house occurred in April and he was not present. But when he previously spoke to detectives, he claimed it happened a couple weeks after New Year's and he was on the porch. Likewise, Nortaniel testified the family moved after shots were fired at the house in April. But Nathaniel testified the family moved on New Year's Day after the fight. A neighbor, Alice Daval, testified to hearing shots but could only say it happened in the spring. Due to the inconsistent statements, a rational jury could have found the claim lacked sufficient corroboration to believe that the shooting occurred. Similarly, the jury heard evidence that Plant displayed a firearm when James saw him near 67th Street and Rhodes Avenue in June. But Nathaniel, who James said was with him, testified that he did not see Plant on that occasion.

¶ 87    Yet, even if the jury believed one or both of those incidents occurred, they could still find that James did not prove he acted with a subjective belief in self-defense when he encountered Plant on July 3rd sitting in the back of the Sonata stopped on Champlain Avenue. James and two passengers in the Sonata testified at trial that Plant had a firearm while he was sitting in the vehicle. But none of them said so in their prior statements. No firearm was found in the black skull cap where Magee testified Plant had deposited it. Additionally, no witness testified that Plant pointed a firearm or was about to shoot at James. Notably, James testified that he was unsure whether Plant had even looked in his direction, much less that Plant was poised to shoot him.

¶ 88    Moreover, the jury could have reasonably concluded that James shot at the Sonata out of animus and desire for revenge. *Cf. Bennett*, 2017 IL App (1st) 151619, ¶ 44 (finding defendant had not proven unreasonable belief in self-defense when evidence showed trier of fact could find defendant was motivated by revenge and anger). Whether Plant had shot at James's house or not, animosity had been stewing between them since the New Year's Eve fight. James told detectives he shot because he "wanted" Plant and "wanted to send a message." Even if James was not seeking Plant on July 3rd, he seized the opportunity to "send a message" when it presented itself. James stopped his vehicle in the middle of the block where no stop signs or obstacle required him to do so. James could have driven away upon noticing Plant, but instead he fired multiple shots. Even then, he did not drive away until Simmons managed to pull away first. These facts and circumstances undermine James's assertion that he was afraid for his life when he decided to shoot at the Sonata. The jury was not required to find James's asserted belief credible. *People v. Rutigliano*, 2020 IL App (1st) 171729, ¶ 82 (noting that a jury is not obliged to find a defendant claiming a subjective belief in self-defense to be credible).

¶ 89    Here, taking the evidence in the light most favorable to the State, as we must, we conclude that a reasonable jury could find the mitigating factor that James acted under an actual, but unreasonable belief in self-defense was not present. Therefore, we will not reduce the conviction to second degree murder.

¶ 90                    C. Right to counsel during lineup and questioning

¶ 91    James next contends that his inculpatory ERI statements should have been suppressed because police obtained the statements after placing him in a lineup without providing counsel as he had requested. He claims his request for counsel barred the subsequent lineup and questioning without counsel present. The State asserts that James waived this issue because it was not raised

in his motion to suppress statements. In his reply brief, James asserts his motion included this issue and notes the State cites the original motion, not the amended motion that was the subject of the suppression hearing. We agree that the State cited the original, rather than amended, motion, but the theory James advances on appeal is not the same that he presented as grounds for suppression of his statements before the trial court. Some factual assertions overlap, but the argument before the trial court was that James's statements were involuntary. On appeal, he argues his right to counsel was violated. A defendant may not argue a different theory for suppression of his confession on appeal from the one he presented before the trial court. *People v. Hughes*, 2015 IL 117242, ¶¶ 45-46. "Close enough" arguments do not preserve an issue for review. *Id*. ¶ 45. Accordingly, we find this issue was not preserved. The issue may be reviewable under the plain error doctrine (*Id*. ¶ 71 (Burke, J., specially concurring)), but James never requested plain error review. A defendant forfeits plain error review if he fails to request it. *People v. Hillier*, 237 Ill 2d 539, 545-46 (2010); see also *People v. Williams*, 193 Ill. 2d 306, 348 (2000) (a defendant may request plain error review for the first time in a reply brief). However, James also claims his trial counsel was ineffective for abandoning this issue in the amended motion to suppress statements. Accordingly, we review this issue solely as a claim of ineffective assistance of trial counsel.

¶ 92        As noted above, the first prong of the *Strickland* test requires a defendant to show counsel's performance was objectively unreasonable. *Peterson*, 2017 IL 120331, ¶ 79. And the defendant must overcome the strong presumption that the challenged action may have been the product of sound trial strategy. *People v. Manning*, 241 Ill. 2d 319, 327 (2011). To overcome the presumption of trial strategy regarding a motion to suppress his statement, "the defendant must demonstrate a reasonable probability that the motion would have been granted and that the outcome of the trial

would have been different." *People v. Utley*, 2019 IL App (1st) 152112, ¶ 55 (quoting *People v. Spann*, 332 Ill. App. 3d 425, 432-33 (2002)).

¶ 93   We find that James cannot demonstrate a reasonable probability that the motion to suppress statements would have been granted had trial counsel included the claim that police violated his right to counsel. Although James had been charged with an unrelated armed robbery, his sixth amendment right to counsel in that case did not extend to require the presence of counsel for a lineup or questioning in this matter. "[T]he sixth amendment right to counsel attaches at or after the initiation of adversarial judicial proceedings-whether by way of a formal charge, preliminary hearing, indictment, information, or arraignment." *People v. Garrett*, 179 Ill. 2d 239, 247 (1997) (citing *Kirby v. Illinois*, 406 U.S. 682, 688-89 (1972)). But the sixth amendment right to counsel is "offense specific." *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991). It attaches only to offenses in a charging instrument and "offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* test." *Texas v. Cobb*, 532 U.S. 162, 173 (2001) (citing *Blockburger v. United States*, 284 U.S. 299 (1932)). Under *Blockburger*, an offense is not the same if it "requires proof of a fact which the other does not." *Id.* (quoting *Blockburger*, 284 U.S at 304). Here, any offense related to the July 3, 2013 shooting would require proof of facts that the armed robbery charge would not. Thus, the matter under investigation in this case was not the same offense as the armed robbery for which James had been charged. And since no adversarial judicial proceedings had been initiated in connection with the shooting at the time James was placed in a lineup and questioned, the sixth amendment right to counsel had not attached. Accordingly, the sixth amendment right to counsel did not bar these investigative procedures. *Cobb*, 532 U.S. at 174; *People v. Martin*, 102 Ill. 2d 412, 423 (1984) (finding a defendant who is charged and represented for an offense may be interrogated without counsel regarding unrelated offenses).

¶ 94    Separately, James had a fifth amendment right to counsel and privilege against self-incrimination. He invoked these rights by stating he would not answer questions without an attorney. Upon his invocation, police ceased questioning him as required. See *People v. Outlaw*, 388 Ill. App. 3d 1072, 1079 (2009) (quoting *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981)) (stating that "if the individual asserts his right to counsel, the interrogation must cease until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police"). However, his invocation did not preclude police from placing him in a lineup. "A person's appearance in a lineup is nontestimonial in nature and does not constitute interrogation." *People v. Bolden*, 197 Ill. 2d 166, 176 (2001) (citing *Kirby*, 406 U.S. at 687-88 and *United States v. Wade*, 388 U.S. 218, 221-23 (1967)).

¶ 95    Thus, the only remaining issue is whether James initiated further communication with the police and waived his right to counsel. James asserts his waiver was not valid. After he invoked his rights, police left him alone in a cold interview room for hours. Then a detective initiated contact when he entered and told James he had "no choice" but to don a jumpsuit and take part in a lineup. Detective Halloran took hours to arrange a lineup after James invoked his right, falsely informed James that four people who were in the car had named him, and stated it was a "foregone conclusion" he would be identified again and he was "beyond being able to say, 'I wasn't there.' " James was then placed in a lineup and again told he was identified. Only after these procedures, did James begin answering questions. James argues these measures were "conscious manipulation" to overbear his will.

¶ 96    In ruling on the motion to suppress based on voluntariness, the trial court commented that it was cognizant of deliberate coercive tactics such as making a suspect "stew," freeze, or starve. However, the court found that such tactics were not employed here and there was no undue delay.

More significant, the court found that James reinitiated communication to ascertain what police knew and try to formulate his own self-serving narrative. We defer to the trial court's factual findings in ruling on a motion to suppress evidence unless such findings are against the manifest weight of the evidence. *People v. Eubanks*, 2019 IL 123525, ¶ 33.

¶ 97        Here, we cannot conclude the trial court's factual findings are against the manifest weight of the evidence. James's brief emphasizes that a detective told him he had "no choice," but the ERI evinces the detective meant, and James understood, that "no choice" only referred to putting the jumpsuit on and being placed in a lineup, nothing more. Though that contact was initiated by the detective, it was permissible because James's fifth amendment rights to counsel and against self-incrimination did not preclude his placement in a lineup. Additionally, the ERI does not show any conduct on the part of the detective during that interaction that could be found to likely elicit an incriminating statement. See *People v. Olivera*, 164 Ill. 2d 382, 391-92 (1995) (police improperly initiate interrogation of a suspect who has invoked his rights by any words or actions that the police should know are reasonably likely to elicit an incriminating response).

¶ 98        More important, James clearly reinitiated conversation about the shooting. He told the detective who brought him the jumpsuit that he was willing to answer questions and later told Detective Halloran, "I wanted to know why I was here, so I'll answer your questions." In addition to re-Mirandizing James and before questioning him, Detective Halloran twice reminded James that he had previously said he would not talk without an attorney present. When asked whether he was willing to waive his rights and speak with the detectives, James clearly and unequivocally waived his right to counsel. His waiver occurred before he was placed in the lineup.[4]

---

[4] James's brief is inconsistent on this fact. The statement of facts and outset of his argument on this issue state James agreed to speak with Detective Halloran before the lineup, but the brief later asserts this occurred after.

¶ 99    Additionally, the ERI substantiates the trial court's assessment that James was "fishing" for information so he could formulate a narrative. Though agreeing to speak with detectives, James was largely unresponsive while detectives revealed what information they had learned. Only after they described evidence implicating him in the shooting, did James become more forthcoming. Yet even then, his statements seemed to craft a narrative to fit the facts that the detectives had revealed. Rather than deny that he had shot at Plant, James shifted the blame, claiming Plant had shot at him first. He further insisted that he tried to "squash" the animosity stemming from the New Year's Eve fight. And he emphasized that he did not go looking for Plant, but "just ran into him."

¶ 100    We also observe that James did not divulge anything about what he did with the firearm, despite Detective Halloran's persistent pleas. Thus, he demonstrated autonomy over what he would answer and what he would not. This underscores the voluntary nature of his interaction with police, including his waiver of counsel.

¶ 101    In James's brief, he acknowledges that he was being held on an unrelated armed robbery, that his sixth amendment right to counsel in the armed robbery case did not extend to the lineup or questioning in this case, and that his invoked fifth amendment right to counsel did not require counsel's presence at the lineup. Despite recognizing these straightforward conclusions from well-established principles, James nevertheless argued that the invocation of his right to counsel barred the subsequent line-up and the entire interrogation. He suggests the United States Supreme Court's decision in *Montejo v. Louisiana*, 556 U.S. 778 (2009), alters the analysis. James urges that the *Montejo* decision indicated that "the right to counsel should be analyzed in a singular fashion regardless of whether it is a Fifth or Sixth Amendment consideration." In addition, James points

to our supreme court's decision in *People v. McCauley*, 163 Ill. 2d 414 (1994), to assert that Illinois courts interpret the right to counsel more favorably to suspects than the federal courts require.

¶ 102    We find *Montejo* and *McCauley* inapposite to this case and neither decision alters our analysis. *Montejo* concerned whether a defendant waived his sixth amendment right to counsel before writing an inculpatory letter of apology to a victim's widow while accompanying detectives to search for the murder weapon after he had been charged with that murder. Having been charged, the defendant's sixth amendment right to counsel attached before the excursion. The Supreme Court held that the standard for assessing whether a defendant waived his sixth amendment right to counsel was the same for determining whether a defendant waived his fifth amendment right to counsel in a custodial interrogation. The *Montejo* decision overruled *Michigan v. Jackson*, 475 U.S. 625 (1986), which had imposed a more protective standard for courts to find a valid waiver of the sixth amendment right to counsel when a defendant is interrogated about an offense after being charged with that offense. Thus, *Montejo* merely removed the fifth and sixth amendment distinction for purposes of assessing whether a defendant waived their right counsel. The decision did not overrule or modify the precedent underlying our analysis that holds a defendant charged with one offense may be placed in a lineup and questioned about an unrelated offense, which is what occurred here.

¶ 103    In *McCauley*, our supreme court found the Illinois Constitution's guarantees of protection against compelled self-incrimination and due process render a waiver of counsel invalid when police fail to inform a suspect that counsel is present and seeking to consult with him. Thus, our supreme court departed from the United States Supreme Court's decision in *Moran v. Burbine*, 475 U.S. 412 (1986), which held otherwise under the fifth amendment. But the circumstances in those cases were not present here. Counsel was not at Area Central seeking to consult with James

when he was questioned regarding this case. More important, the decisions of our supreme court are consistent with the United States Supreme Court's decisions under the fifth and sixth amendment that are relevant to the issues in this case. James's brief does not expressly argue that we should find the Illinois Constitution affords greater protections that render his waiver of counsel invalid and statement inadmissible. But even if that is the suggestion, it is not this court's prerogative to depart from our supreme court's precedent. See *Blumenthal v. Brewer*, 2016 IL 118781, ¶ 28 (the appellate court has no authority to repudiate controlling decisions of the Illinois Supreme Court).

¶ 104    For these reasons, there is no reasonable likelihood that the motion to suppress statements would have been granted had counsel included an argument based on a violation of James's right to counsel—especially since the trial court was expressly cognizant of the coercive tactics James alleges yet made contrary findings supported by the record. Accordingly, James cannot demonstrate ineffective assistance of trial counsel on this issue.

¶ 105                         D. Failure to object to prosecutor's closing arguments

¶ 106    Finally, James claims his trial counsel was ineffective for failing to object to several of the prosecutor's statements in closing argument.[5] To prevail on such a claim, a defendant must show the guilty verdict resulted from trial counsel's failure to object. *People v. Jackson*, 2020 IL 124112, ¶ 91. But a defendant cannot make such a showing if the prosecutor's remarks were not substantially prejudicial. *Id*. Substantial prejudice occurs "if the improper remarks constituted a material factor in a defendant's conviction." *People v. Wheeler*, 226 Ill.2d 92, 123 (2007).

---

[5] James's brief includes this argument within a broader claim of ineffective assistance of counsel. The claim also asserted counsel's ineffectiveness in relation to the response to the jury note and theories argued in the motion to suppress statements. Since we addressed both of those contentions in other sections, we limit our discussion to ineffectiveness regarding the State's closing argument.

¶ 107　　　　　First, James alleges the prosecutor[6] attempted to shift the burden of proof with the statement, "The only person in this room who had control over the witnesses to the crime he committed, was this Defendant." The State's rebuttal argument included a similar statement. We do not believe that statement shifted the burden of proof. "The reviewing court must consider the closing argument in its entirety, and the alleged improper remarks must be considered in their proper context. [Citation.]" *People v. Green*, 2017 IL App (1st) 152513, ¶ 77. In context, the statement appears thusly:

> "So, let's talk about the evidence. Yes, witnesses have felony convictions. We don't choose the witnesses to crimes. The only person in this room who had control over the witnesses to the crime he committed, was this Defendant. He chose where to strike. He chose to shoot at Floyd Plant with that car packed. He made that choice."

Read in context, the prosecutor's statement sought to blunt the effect of the fact that some of the State's witnesses, especial Plant, were convicted felons. Following these statements, the prosecutor discussed reasons to find Plant's testimony that he did not have a firearm credible and reasons to find Magee and Minor's testimony that he did incredible. A prosecutor improperly shifts the burden of proof to the defendant when remarks suggest the defendant was required to present evidence of his innocence but failed to do so. See, *e.g.*, *People v. Smith*, 401 Ill. App. 3d 538, 542 (2010) ("you didn't hear any evidence that he wasn't trying to kill anyone"); *People v. Fluker*, 318 Ill. App. 3d 193, 203 (2000) ("Did anybody come on that stand and say the man didn't do it?"). Taken in context, the prosecutor's statement here did not suggest James was required but failed to present evidence of his innocence. Rather, the statement was offered amid an argument as to why the State had proven him guilty. Therefore, we do not find the statement prejudicial.

---

[6] Two ASAs prosecuted this case. One offered the State's initial closing argument and the other the State's rebuttal. For simplicity, we will refer to the two ASAs singularly as "the prosecutor" in this section.

¶ 108     Second, James contends the State subtly accused him of intimidating Magee and Minor by the statement: "It's not easy to confront the person who shot into a car you were riding in, a person who shot you in the chest, collapsed your lung, killed another person in your car." "Generally, prosecutorial comments which suggest that witnesses are afraid to testify because defendant threatened or intimidated them, when not based upon any evidence in the record, are highly prejudicial and inflammatory." *People v. Sims*, 285 Ill. App. 3d 598, 605 (1996). However, this rule concerns accusations that the defendant (or another on their behalf) intimidated the witness through some act apart from the offense at issue in the case. See, *e.g.*, *People v. Toliver*, 347 Ill. App. 3d 203, 225 (2004) (comments proper when trial evidence showed fellow gang members and relatives of the defendants threatened a witness after she testified before the grand jury then recanted her testimony at trial). Here, the prosecutor suggested it was inherently intimidating for the witnesses to testify against a person who had shot at them, not that James separately tried to intimidate them from testifying against him. Further, the statement was based upon evidence in the record. Indeed, the State's evidence and James's affirmative defense were in accord that James had shot at the witnesses and killed McMullen.

¶ 109     Next, James alleges the prosecutor misstated the law with the remark: "He didn't believe it was self-defense. So it can't be unreasonable." James argues that instead of "urg[ing] that James lacked even a subjective, unreasonable belief in self-defense," the prosecutor merged unreasonable belief in self-defense with justified self-defense by this remark. We disagree. Prior to the challenged remark, the prosecutor recited the second degree murder instruction and noted the "first part" required that "He has to believe that those circumstances exist." The prosecutor went on to cite trial evidence that, in his view, undermined that James believed circumstances existed which would justify the deadly force he used. Thus, contrary to his assertion, the prosecutor did "urge

that James lacked even a subjective, unreasonable belief in self-defense." We find the prosecutor's remarks consistent with the second degree murder instruction and did not misstate the law.

¶ 110    Lastly, James argues the prosecutor misstated the law by asserting that James acted intentionally.

> "When you look at all the evidence, it's abundantly clear, that what he did back on
>
> July 3rd of 2013, was intentional. It wasn't self-defense. It wasn't mistaken belief
>
> in self- defense. It was intentional."

James notes that an act done in self-defense or an unreasonable belief in self-defense is intentional and, therefore, if the jury found be acted intentionally, they could still find he was justified under self-defense or reduce the offense to second degree murder. But the prosecutor's remark indicated the opposite—that if they found he acted intentionally, they could not find he was justified under self-defense or reduce the offense to second degree murder. The State counters that the prosecutor did not use "intentional" in the "legal sense" and, in context of the entire argument, the remark was offered to refute that James acted under a belief that his use of force was necessary for self-defense.

¶ 111    We note that the challenged statement was the prosecutor's final remark in rebuttal. In the initial summation, the prosecutor argued:

> "[T]his was not justified.
>
> There was no threat to Antonio James that day, none. Just vengeance.
>
> Everything you have heard during the course of this trial screams of intentional
>
> action. The intentional actions of this Defendant, in gunning down three people,
>
> and successfully killing one of them. The intentional actions of pointing a loaded

gun at a car full of people. The intentional actions of repeatedly pulling the trigger
* * *.

When he talked to the police in September of 2014, he expressed what his intent was on July 3rd, 2013. He was sending a message. There was no lawful justification. There was no mitigating factor. There was just the intent to kill."

The rebuttal also included:

"His actions belie a person who did something out of self-defense. What his actions show, is somebody who did something out of vengeance."

Considering the entirety of the prosecutor's closing arguments, we do not believe the prosecutor was contending that James could not be found justified under self-defense or the offense could not be reduced to second degree murder if he acted intentionally. Rather, the prosecutor was arguing that James's intent was driven by vengeance and his desire to "send a message," like he had told police, as opposed to a belief that he needed to use deadly force to avert an imminent threat. Thus, the prosecutor's remarks were directed toward an issue of fact—James's mental state—and not offered as the legal standard for the jury to apply. That distinction is evident since the prosecutor articulated the correct standards for self-defense and second degree murder based on an unreasonable belief in self-defense before his remarks about James's "intent."

¶ 112    Apart from that, the court properly instructed the jury on self-defense and second degree murder based on an unreasonable belief in self-defense. Even prejudicial statements may be cured by the court's proper instructions of law. *People v. Simms*, 192 Ill. 2d 348, 396 (2000). Overall, even if we found the prosecutor's statements improper, we do not believe the remarks were a material factor in the conviction and, therefore, did not substantially prejudice James. Consequently, James cannot demonstrate ineffective assistance of counsel for failing to object.

¶ 113                              III. CONCLUSION

¶ 114        For the foregoing reasons, we find the trial court did not err in responding to the jury's question, the jury could find James had not proven the existence of a mitigating factor to reduce his conviction to second degree murder, the trial court did not err in denying his motion to suppress statements, and trial counsel was not ineffective for failing to object to statements in closing argument. Accordingly, we affirm the judgment of the trial court.

¶ 115        Affirmed.